**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| | : | **VIOLATIONS: 18 U.S.C. § 371** |
| **v.** | : | **(Conspiracy to Violate IEEPA** |
| | : | **and TWEA and to Defraud the** |
| | : | **United States)** |
| **The former ABN AMRO** | : | |
| **BANK N.V., now known as** | : | **31 U.S.C. §§ 5318(h) and 5322** |
| **THE ROYAL BANK OF** | : | **(Failure to Maintain an Adequate** |
| **SCOTLAND N.V.,** | : | **Anti-Money Laundering Program)** |
| | : | |
| **Defendant.** | : | |

**INFORMATION**

The United States informs the Court that:

**GENERAL ALLEGATIONS**

At all times material to this Information:

1.       Defendant, the former ABN AMRO BANK N.V., now known as The Royal Bank of Scotland N.V. (hereinafter "ABN"), was a publicly-traded financial institution registered and organized under the laws of the Netherlands.

2.       Defendant ABN was subject to oversight and regulation in the United States by the Board of Governors of the Federal Reserve System.

3.       Defendant ABN conducted United States Dollar clearing at ABN's New York Branch.

4.      Defendant ABN facilitated United States Dollar clearing through financial institutions in New York and others located elsewhere in the United States.

5.      From in or about June 1995 through in or about December 2005, Defendant ABN facilitated United States Dollar transactions for a number of co-conspirators, both known and unknown to the United States.  For the most part, these co-conspirators consisted primarily of banks from Iran, Libya, the Sudan, and Cuba.

6.      From in or about January 2006 through in or about December 2007, a limited number of additional transactions involving banks from Iran, the Sudan, and Cuba occurred.

7.      Over the years, the United States has employed sanctions and embargoes with regard to countries such as Iran, Libya, the Sudan, and Cuba.  Whether by statute, Executive Order, or regulation, those sanctions arose in response to repeated support by those nations for international terror against United States citizens and its allies.

8.      From in or about June 1995 through in or about December 2007, financial transactions conducted by wire on behalf of Iranian and Cuban banks were subject to United States sanctions.  From in or about November 1997 through in or about December 2007, financial transactions conducted by wire on behalf of Sudanese banks were subject to United States sanctions.  From in or about June 1995 until in or about September 2004, financial transactions conducted by wire on behalf of Libyan banks were subject to United States sanctions.

9.      The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which was located in the District of Columbia, among other things, administered and enforced economic and trade sanctions against targeted foreign countries and entities associated

with those targeted countries.  OFAC acted under Presidential national emergency powers, as well as authority granted by specific legislation, to impose controls on certain transactions.

10.      In regards to certain sanctions against Iran, Libya, the Sudan, and Cuba, and Iranian, Libyan, Sudanese, and Cuban banks, OFAC had responsibility for administering regulations against these countries and entities and was empowered to authorize transactions with these countries and entities through the granting of authorization, in the form of a license.

<u>International Emergency Economic Powers Act</u>

11.      The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States to impose economic sanctions against a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat.

<u>Iranian Sanctions</u>

12.      On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."  Executive Order No. 12957, as expanded and continued by Executive Order Nos. 12959 and 13059 and Presidential Notice of March 10, 2004, was in effect at all times relevant to this Information.

13.      Executive Order Nos. 12957, 12959, and 13059 (collectively, the "Iranian Executive Orders") imposed economic sanctions, including a trade embargo, on Iran.  The Iranian Executive Orders prohibited, among other things, the exportation, re-exportation, sale, or

supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person.  The Iranian Executive Orders also prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, any prohibition set forth in the Executive Orders.

<u>The Iranian Transactions Regulations</u>

14.     The Iranian Executive Orders authorized the Secretary of the Treasury, in consultation with the Secretary of State, "to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes" of the Iranian Executive Orders.   Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, implementing the sanctions imposed by the Iranian Executive Orders.   The Iranian Transaction Regulations were in effect at all times relevant to this Information.

15.     Under the Iranian Transactions Regulations, 31 C.F.R. Part 560:

a.      Section 560.204 provided that no goods, technology, or services may be exported, re-exported, sold, or supplied to Iran, directly or indirectly, from the United States or by a United States person wherever located, without authorization.  31 C.F.R. § 560.204.

b.      Section 560.203 prohibited any transaction by any United States person or within the United States that evaded or avoided, or had the purpose of evading or avoiding, or that attempted to violate, any of the prohibitions set forth in Part 560.  Section 560.203 further prohibited any attempt to violate the prohibitions contained in Part 560.  31 C.F.R. § 560.203.

16.     OFAC had responsibility for administering the Iranian Transactions Regulations and was the entity empowered to authorize transactions with Iran during the embargo through the granting of a license.

<u>The Libyan Sanctions</u>

17.     On January 7, 1986, President Ronald Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya.  One day later, the President issued Executive Order No. 12544, which also ordered the blocking of all property and interests in property of the Government of Libya.  President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801.  These sanctions remained in effect until September 22, 2004, when President George W. Bush issued Executive Order No. 13357, which terminated the national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.  The Libyan Sanctions were in effect during times relevant to the Information.

<u>The Sudan Sanctions</u>

18.     On November 3, 1997, President William J. Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan.  President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412.  The Executive Orders prohibited virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) trade- and service-related

transactions with Sudan by United States persons, including financing, facilitating or

guaranteeing such transactions.  The Executive Orders further prohibited "[a]ny transactions by a

United States person or within the United States that evades or avoids, has the purposes of

evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]."

With the exception of certain exempt or authorized transactions, OFAC regulations

implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from

the United States.  The Sudanese Sanctions were in effect at all times relevant to the Information.

<u>The Cuban Sanctions</u>

19.     Beginning with Executive Orders and regulations issued at the direction of

President John F. Kennedy, the United States had maintained an economic embargo against

Cuba through the enactment of various laws and regulations restricting United States trade and

economic transactions with Cuba.   OFAC controlled imports and blocked all transactions

relating to Cuban assets based upon the Cuban Assets Control Regulations ("CACR"), which

were promulgated under the Trading With the Enemy Act ("TWEA"), Title 50, United States

Code Appendix, Sections 1-39, and 41-44.

20.     Unless authorized by OFAC, United States persons were prohibited from

engaging in financial transactions, among other types of transactions, which were by, at the

direction of, or for the benefit of, Cuba or Cuban nationals, or which involved property in which

Cuba or Cuban nationals had any direct or indirect interest, including all "transfers of credit and

all payments" and "transactions in foreign exchange."   31 C.F.R. § 515.201(a).   Unless

authorized by OFAC, United States persons were prohibited from engaging in transactions

involving property in which Cuba or Cuban nationals had any direct or indirect interest,

including all "dealings in . . . any property or evidences of indebtedness or evidences of ownership of property by any person subject to the jurisdiction of the United States" and all "transfers outside the United States with regard to any property or property interest subject to the jurisdiction of the United States."   31 C.F.R. § 515.201(b).   The Cuban Assets Control Regulations also prohibited any "transaction for the purpose or which has the effect of evading or avoiding any of the prohibitions" set forth in the OFAC regulations.   31 C.F.R. § 515.201(c). The Cuban Sanctions were in effect at all times relevant to the Information.

Bank Secrecy Act

21.     The Bank Secrecy Act ("BSA"), 31 U. S. C. § 5311 *et seq.*, and its implementing regulations, which Congress enacted to address an increase in criminal money laundering activities utilizing financial institutions, required domestic banks, insured banks and other financial institutions to maintain programs designed to detect and report suspicious activity that might be indicative of money laundering and other financial crimes, and to maintain certain records and file reports related thereto that are especially useful in criminal, tax or regulatory investigations or proceedings.

22.     Pursuant to Title 31, United States Code, Section 5318(h)(1), defendant ABN was required to establish and maintain an anti-money laundering ("AML") program, including, at a minimum:

> (a) the development of internal policies, procedures, and controls;
>
> (b) the designation of a compliance officer;
>
> (c) an ongoing employee training program; and
>
> (d) an independent audit function to test programs.

## COUNT ONE
## CONSPIRACY TO VIOLATE IEEPA AND TWEA
## AND TO DEFRAUD THE UNITED STATES
## (18 U.S.C. § 371)

1.     Paragraphs 1 through 22 of the General Allegations are re-alleged as if fully set forth herein.

2.     From in or about May 1995, and continuing until in or about December 2007, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, Defendant, the former ABN AMRO BANK N.V., now known as The Royal Bank of Scotland N.V., did willfully and knowingly conspire, confederate and agree with persons, both known and unknown to the United States, to commit offenses against the United States, that is:

(a)  to defraud the United States by impeding, impairing, obstructing and defeating the lawful functions of the United States Department of Treasury, Office of Foreign Assets Control, in the application and enforcement of sanctions and embargo regulations against Iran, Libya, the Sudan, and Cuba, and entities affiliated with Iran, Libya, the Sudan, and Cuba;

(b)  to engage in financial transactions with entities affiliated with Iran, Libya, and the Sudan, in violation of the International Emergency Economic Powers Act, Title 50, United States Code, Section 1705, and regulations and embargoes issued thereunder; and

(c)  to engage in financial transactions with entities associated with Cuba, in violation of the Trading With the Enemy Act, Title 50, United States Code Appendix, Sections 1-39, and 41-44, and regulations and embargoes issued thereunder.

## PURPOSES OF THE CONSPIRACY

3.      A purpose of the conspiracy was for the defendant and the co-conspirators to profit financially by undertaking a variety of financial transactions in or through the United States.

4.      A further purpose of the conspiracy was for the defendant and the co-conspirators to conceal the movement of the co-conspirators' property and assets through the United States from the United States Government and others.

5.      A further purpose of the conspiracy was for the defendant and the co-conspirators to circumvent United States sanctions by manipulating material information concerning entities sanctioned by the United States, such as the true originator or beneficiary of financial transactions, in order to facilitate illegal United States Dollar transactions.

6.      A further purpose of the conspiracy was for the defendant and the co-conspirators to conceal from the United States and financial regulatory agencies the full scope and extent of the defendant's violations of United States sanctions and regulations concerning entities sanctioned by the United States.

## MANNER AND MEANS

7.      It was part of the conspiracy that the defendant discussed with the co-conspirators how to format United States Dollar message payments so that such payments would avoid detection by automated filters used by financial institutions in the United States and thus evade United States sanctions.

8.      It was part of the conspiracy that the defendant removed names and references to the co-conspirators in United States Dollar message payments routed through the United States.

9.      It was part of the conspiracy that the defendant altered the names and references to the co-conspirators in United States Dollar message payments routed through the United States.

10.     It was part of the conspiracy that the defendant instructed the co-conspirators to use code words in United States Dollar payment messages.

11.     It was part of the conspiracy that the defendant created a special processing queue to manually and materially alter any of the co-conspirators' United States Dollar message payments that were to be routed through the United States.

12.     It was part of the conspiracy that the defendant replaced the names of the co-conspirators with the defendant's name in United States Dollar letters of credit transactions.

13.     It was part of the conspiracy that the defendant replaced the names of the co-conspirators with the defendant's name in United States Dollar foreign exchange transactions.

14.     It was part of the conspiracy that the defendant created "Special Conditions" in the defendant's payment manuals in order to process any co-conspirators' United States Dollar transactions.

15.     It was part of the conspiracy that the defendant caused its United States affiliates to submit materially false and misleading reports or statements to the United States Department of the Treasury, OFAC.

## OVERT ACTS

16.     In furtherance of the conspiracy and to achieve the objects and purposes thereof, the defendant and the co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts,

among others:

   a.   In or about May 1995, co-conspirators requested that the defendant assist them in circumventing United States laws regarding transactions with sanctioned entities.

   b.   In or about May 1995, the defendant agreed to assist the co-conspirators by facilitating the co-conspirators' United States Dollar transactions.

   c.   On various dates certain between in or about June 1995 and in or about May 2005, the defendant used a special processing queue to manually and materially alter the co-conspirators' United States Dollar transactions.

   d.   On various dates certain between in or about June 1995 and in or about December 2007, the defendant, or subsidiaries or associates in which the defendant maintained a minority ownership interest, used various methods to materially alter United States Dollar payment messages and transactions from the co-conspirators.

   e.   On various dates certain between in or about June 1995 and in or about December 2005, the defendant caused its United States affiliates to make material omissions to the United States Government, specifically to the Department of the Treasury, Office of Foreign Assets Control, concerning the transactions the defendant was altering for the co-conspirators.

   f.   In or about November 2003, the defendant created "Special Conditions" in the defendant's payment procedure manual to explain how to alter and process the co-conspirators' United States Dollar transactions.

   g.   On various dates certain between in or about November 2003 and in or about May 2005, the "Special Conditions" section of the defendant's payment procedure

manual specifically stated: "Payments by order of Iranian Banks . . . maintaining accounts with ABN, Dubai are to be handled with extra care to ensure the wordings "Iran" etc., are not mentioned in the payment due to OFAC regulations."

h.    In or about November 2003, the defendant instructed the co-conspirators to use the code word "SPARE" in the United States Dollar transactions.

All in violation of Title 18, United States Code, Section 371.


[REST OF THE PAGE IS INTENTIONALLY BLANK]

## COUNT TWO
## FAILURE TO MAINTAIN AN ADEQUATE ANTI-MONEY LAUNDERING PROGRAM
### (31 U.S.C. §§ 5318(h) and 5322)

1.      Paragraphs 1 through 22 of the General Allegations are re-alleged as if fully set forth herein.

2      From in or about January 1998, and continuing until in or about December 2005, the exact dates being unknown to the United States, within the District of Columbia and elsewhere,  Defendant, the former ABN AMRO BANK N.V., now known as The Royal Bank of Scotland N.V., did willfully fail to establish an adequate anti-money laundering program, including, at a minimum, (a) the development of internal policies, procedures, and controls; (b) the designation of a compliance officer; (c) an ongoing employee training program; and (d) an independent audit function to test programs.

All in violation of Title 31, United States Code, Sections 5318 (h) (1) and 5322.

_____

RONALD C. MACHEN JR.
United States Attorney
District of Columbia
D.C. Bar No. 447-889
555 4th Street, N.W.
Washington, D.C.  20530
(202) 514-6600

_____

JAMES MEADE, Acting Chief
Asset Forfeiture and
  Money Laundering Section
Criminal Division
United States Department of Justice
D.C. Bar No. 414-732
1400 New York Avenue, N.W.
Washington, D.C.  20530
(202) 307-2115